```
                                            USDC SDNY
                                            DOCUMENT
                                            ELECTRONICALLY FILED
                                            DOC #: _____
UNITED STATES DISTRICT COURT                DATE FILED: 02/16/2017
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DANIEL MARTIN GOLD,                 :
                                    :
                    Plaintiff,      :
                                    :       No. 14 Civ. 5485 (JFK)
    -against-                       :
                                    :       OPINION & ORDER
AMERICAN MEDICAL ALERT CORP.,       :
                                    :
                    Defendant.      :
------------------------------------X
```

APPEARANCES

For Plaintiff Daniel Martin Gold:
    KARLINSKY LLC
    Martin E. Karlinsky
    Amy A. Lehman

For Defendant American Medical Alert Corp.:
    FOX ROTHSCHILD LLP
    James Lemonedes
    Barri A. Frankfurter

**JOHN F. KEENAN, United States District Judge:**

    Plaintiff Daniel Martin Gold brings this action for breach of contract alleging that Defendant American Medical Alert Corporation ("AMAC") terminated his employment without cause, in violation of his employment agreement with the company. AMAC moves for summary judgment, arguing that the undisputed facts establish that Gold was terminated for cause and that AMAC is therefore entitled to judgment as a matter of law. As explained below, there are genuine issues of material fact regarding whether Gold was terminated for cause under the employment agreement. Accordingly, the Court denies AMAC's motion for summary judgment.

1

**Background**

Unless otherwise noted, the following facts are not in dispute. AMAC is a healthcare communications company incorporated in New York with its principal place of business in Long Island City, New York. (Compl. ¶¶ 4-5.) It sells products such as personal emergency response systems, electronic medication reminder devices, and disease management monitoring appliances. (Id. ¶ 5.) Gold, a citizen of Virginia, began doing consulting work for AMAC in 2008 and entered into an employment agreement with the company in January 2010. (Id. ¶ 3; Def.'s Loc. R. 56.1 Statement ¶¶ 4, 6 [hereinafter Def.'s 56.1 Statement].) In March 2012, the parties agreed to a second employment agreement—the contract at issue here—which provided that Gold would serve as the senior vice president for AMAC's Health and Safety Monitoring Systems Division. (Def.'s 56.1 Statement ¶ 6; Decl. of James M. Lemonedes Ex. D.) The agreement covered a three-year period from January 1, 2012, through December 31, 2014, (see Lemonedes Decl. Ex. D at 1), and by its terms is governed by New York law. (See id. at 5.)

If AMAC terminated Gold without cause, the employment agreement provided that Gold would be entitled to certain compensation and benefits, including his annual base salary of $240,000.00 through the third year of the agreement, a bonus payment for the year of his termination, and continued health

benefits. (Id. at 3.)  Section 9(a)(iii) of the agreement defined "cause" to include "the commission of an act of bad faith (i.e., an act involving actual or constructive fraud, or a design to mislead or deceive another, or the conscious doing of a wrong because of dishonest purpose or motivated by ill will)." (Id.; Def.'s 56.1 Statement ¶ 7.)  Under section 9(a)(vi) of the agreement, any violation by Gold of AMAC's Code of Business Conduct and Ethics (the "Code of Conduct") also amounted to "cause." (Lemonedes Decl. Ex. D at 3; Def.'s 56.1 Statement ¶ 7.)

The Code of Conduct provided, among other things that each director, officer, or employee of AMAC "has a responsibility to all other directors, officers, employees and to [AMAC] itself"; that each employee must "act responsibly, in good faith and with competence and diligence . . . without misrepresenting material facts or allowing your independent judgment to be subordinated"; that all employees "must handle any actual or apparent conflict of interest in an ethical manner"; that conflicts of interest "exist when a person's private interest interferes in any way with the interest of [AMAC]," including by "taking actions or having interests that interfere with your ability to effectively and objectively perform your work"; and that employees "should not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation

3

of material facts, or any other unfair-dealing practice."
(Lemonedes Decl. Ex. E at 1-3; see also Def.'s 56.1 Statement
¶¶ 8-11.)

AMAC terminated Gold on October 31, 2012. (Def.'s 56.1 Statement ¶ 41.)  In a written termination letter, AMAC informed Gold that his termination was for cause under Sections 9(a)(iii) and 9(a)(vi) of his employment agreement. (Id. ¶¶ 41, 43; Lemonedes Decl. Ex. I.)  Specifically, the termination letter described the basis for Gold's termination as follows:

> We have learned that you directed an employee to complete a "special project" for you -- a memo whose sole purpose was to prevent the Company's hire of a new sales executive and protect your own position.
>
> You advised the employee that the project would require that he not think of himself as an AMAC employee, and that he would have to separate himself completely from his employment with the Company in order to complete the project.
>
> You offered to pay him for this so-called project out of your own pocket.  You told him to keep his involvement in the project completely confidential from the Company. You also instructed him to deny that he had played any role in the so-called project if the Company were to ask him about it.

(Lemonedes Decl. Ex. I at 1.)

In support of its position that Gold was terminated for cause, AMAC produces an October 26, 2012 "Incident Report" prepared by Robert Farrish, the other AMAC employee referenced

4

in Gold's termination letter. (Def.'s 56.1 Statement ¶ 13; Lemonedes Decl. Ex. F.) Because the Incident Report supplies the principal evidence that AMAC argues entitles it to summary judgment, the Court quotes the body of the report in full. It reads:

> Daniel came to LIC on 10/10 for some meetings. In the morning he asked me go on a walk with him around the block. Outside he asked me if I had the objectivity and professionalism to completely separate myself from my employment in order to complete a special project for him. He said that we worked together well, referencing my proposal writing skills and several memos and other correspondence that I had written for him or with him (examples attached). He said that someone new was being put in charge of sales, someone who was a "cell phone salesman" that had no prior experience in healthcare. He said that this was not acceptable.
>
> Daniel then said that he would pay me several hundred dollars to work on a special memo that would put pressure on AMAC not to dismantle the current authority structure or business model, and he used the phrase "put an atomic bomb up AMAC's ass with the skeletons in its closet." He said it was a difficult task, because I would be called to write something that would demand that I don't think of myself as an AMAC employee, and that it would be a document that would shake things up.
>
> He said that because of the sensitive nature of this document, he was going to prepare a contract for me to sign that included a confidentiality agreement. He said the reason for that was if I was ever

>questioned by AMAC afterwards about the content of this document or its formulation, I would be able to reference this confidentiality clause and wouldn't have to say anything. I was very uncomfortable with this idea. I told Daniel he didn't need to pay me any money, that I had written many documents with him in the past and had never discussed them with anyone.
>
>The next day he came into my office and mentioned the project again. I told him I'd rather not sign any contracts or take money. He said for me not to be spooked out by his request, that it was standard practice to sign such a contract. Although I did not outright refuse to sign anything at that moment, I never would have done so nor would I have taken any money. Since he is my supervisor, I wasn't sure what to do.
>
>He called me later that day, and I recorded the call. During the call he again stated that he was going to "put a bomb up AMAC's ass." I asked him to clarify, and he said "put pressure on them." I didn't ask exactly what that meant. At the end of the call he said we would start on the project tomorrow and that he hoped he didn't "spook me out" in reference to the contract and money.
>
>On Friday he called me and told me that the project would not be necessary after all. I was relieved, but concerned about what the ramifications would be for me and the company if he went through with whatever he intended to do.

(Lemonedes Decl. Ex. F.)

Farrish now lives in Germany, is no longer associated with AMAC, and was not deposed in this case. (See Lemonedes Reply

6

Decl. ¶ 4; id. Ex. A at 1.)  According to the undisputed deposition testimony of Seth Muraskin, AMAC's vice president of human resources at the time of Gold's termination, the Incident Report was maintained by AMAC in accordance with company policies. (See Def.'s 56.1 Statement ¶¶ 37, 40.)

Gold disputes several aspects of the Incident Report and offers his own account of his conversations with Farrish.  In his deposition, Gold testified that before speaking with Farrish he had developed concerns regarding operational and regulatory issues at AMAC and had communicated some of these concerns to the company's leadership. (Gold Dep. Tr. 145:17-145:25, 148:19-148:25.)  According to Gold, he had already decided to terminate his employment with the company when he spoke with Farrish, and the document he wanted Farrish to review was his own resignation letter. (Id. at 169:14-170:12.)  Gold testified that he wanted to speak with Farrish because he felt badly for the sales team, wanted to share his thoughts on why he was leaving the company, and wanted to convey to Farrish that many of the values Gold had developed would be retained after his departure. (Id. at 185:16-185:20, 187:3-187:12.)

Gold testified that he did not tell Farrish what the letter would be about because he was concerned that Farrish "might share it with the rest of the sales team," which would "cause tremendous stress during a period of time when we were about to close on a lot

7

of deals." (Id. at 188:5-188:9.)  Gold denied telling Farrish that the letter would be designed to "push" AMAC or to affect decisions regarding the management team. (Id. at 161:8-161:16.) He also testified that he did not believe he said that the letter was intended as a "bomb to shake things up." (Id. at 164:2-164:7.)  Gold acknowledged that, based on a transcript of an October 11, 2012 conversation between Farrish and him, it appeared Gold said something like "bomb ass," but he did not know what he would have meant by that statement. (Id. at 164:8-164:19.)  Gold also stated that he did not recall using the words "put an atomic bomb up AMAC's ass," as alleged in the Incident Report. (Id. at 190:2-191:5.)

    Gold testified that he asked Farrish if he could be objective, disinterested, and fair-minded if he reviewed the letter, but he did not recall referring to the task as a "special project" or saying that it would require Farrish to completely separate himself from his employment. (Id. at 173:23-174:25.)  Nor did Gold remember telling Farrish that he would be called on to not think of himself as an AMAC employee or that Gold would draft a confidentiality agreement for Farrish to sign. (Id. at 181:4-183:7.)  Gold explained that "a confidentiality agreement in this context would not make sense for an attorney to suggest, because it doesn't make any legal sense." (Id. at 183:2-183-7.) According to Gold, he suggested that he might have to pay

8

Farrish out of his own pocket for reviewing the letter. (Id. at 160:2-160:12, 208:7-208-12.)  Farrish then mentioned an amount around $50.00 or $100.00 but later said that no payment would be necessary. (Id. at 160:2-160:12, 208:7-208:12.)

In an affidavit submitted in support of his opposition to AMAC's motion for summary judgment, Gold specifically denies several statements in the Incident Report.  In the affidavit, Gold states, among other things, that he:  "never asked Farrish if he 'had the objectivity and professionalism to completely separate [himself] from [his] employment in order to complete a special project,'"; "never told Farrish that [Gold] wanted him to 'work on a special memo that would put pressure on AMAC not to dismantle the current authority structure or business model.'"; "never stated that the document would 'shake things up'"; "never told Farrish that [Gold] would draft a contract with a 'confidentiality agreement' for him to sign"; "never asked Farrish not to think of himself as an AMAC employee"; and "never told Farrish to 'deny that he had played a role' in drafting the letter." (Aff. of Daniel Martin Gold ¶¶ 19-21, 23-24.)

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV.

9

P. 56(a).  A dispute about a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.  In considering the evidence, "all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought." Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1223 (2d Cir. 1994).  Nevertheless, the non-movant "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Liberty Lobby, Inc., 477 U.S. at 248 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).

### III. Discussion

The Court considers at the outset two arguments bearing on the evidence it may consider on this motion.  First, Gold urges the Court to disregard the Incident Report because AMAC has not shown that it will be admissible at trial.  Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED R. CIV. P. 56(c)(2).  AMAC indicates that it is not clear whether Farrish will testify at trial because he now lives in Germany and is no

10

longer associated with the company. However, AMAC submits that the Incident Report will be admissible as a business record under Federal Rule of Evidence 803(6) through the testimony of Seth Muraskin, AMAC's former vice president of human resources. Because the report appears to have been prepared at or near the time of the events, by Farrish, a person with knowledge, the Court finds it sufficiently likely that the report will be admissible at trial to consider it on this motion. See FED. R. EVID. 803(6).

Likewise, the Court rejects AMAC's contention that it must disregard Gold's sworn affidavit because Gold now expressly denies making certain statements alleged in the Incident Report that he previously testified he did not recall. Under the so-called sham issue of fact doctrine, a party may not defeat summary judgment by submitting an affidavit that contradicts the party's previous sworn testimony. See In re Fosamax Prod. Liab. Litig., 707 F.3d 189, 193 (2d Cir. 2013). The contradictions, however, must be "inescapable and unequivocal in nature" to create a sham issue of fact. Id. at 193 & n.4 (citing Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 696 (2d Cir. 2012). Such a contradiction may be found where a party seeks to defeat summary judgment by submitting an affidavit with factual allegations about an event the party previously testified he or she could not recall. See, e.g., Raskin v. Wyatt

11

Co., 125 F.3d 55, 63 (2d Cir. 1995) (affirming summary judgment in employment age discrimination case where plaintiff produced a declaration stating that his supervisor expressed concern that the plaintiff "would not remain with [the company] long enough to learn the manager's job," but previously testified that he did not remember the points covered during the conversation). Here, however, Gold's affidavit does not create an inescapable contradiction.  If one is alleged to have said something but does not recall saying it, this suggests that the statement was never made, particularly when the statement would have been out of the ordinary.  The Court therefore does not view Gold's statements as creating the type of clear contradiction that would warrant disregarding his affidavit.  To the extent that the statements may be viewed as inconsistent, the issue is one of credibility reserved for the jury. See In re Fosamax, 707 F.3d at 193 n.4 (citing Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010).

Turning to the substance of the motion, the Court finds that genuine issues of material fact exist, precluding summary judgment.  AMAC argues that the undisputed facts establish that Gold was terminated for cause under sections 9(a)(iii) and 9(a)(vi) of his employment agreement, entitling AMAC to judgment as a matter of law.  The Court disagrees.  As an initial matter, the question of whether Gold violated sections 9(a)(iii) and

12

9(a)(vi) does not lend itself to summary judgment. Section 9(a)(iii) defines "cause" to include "the commission of an act of bad faith (i.e., an act involving actual or constructive fraud, or a design to mislead or deceive another, or the conscious doing of a wrong because of dishonest purpose or motivated by ill will)." (Lemonedes Decl. Ex. D at 3.) Where, as here, questions of intent and state of mind are implicated, summary judgment is generally inappropriate. See Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984). Likewise, in arguing that Gold was terminated for cause under section 9(a)(vi), AMAC relies on Code of Conduct provisions prohibiting, among other things, "conflicts of interest" and requiring employees to act in "good faith" and to "deal fairly with . . . employees." (See 56.1 Statement ¶¶ 9-11.) As with the question of bad faith, the determination of whether Gold's conduct violated these standards is a fact-specific determination not readily subject to summary judgment.

Further, to the extent that these questions might otherwise be resolved at this stage, genuine issues of material fact exist regarding the events described in the Incident Report, precluding summary judgment. Gold denies, among other things, telling Farrish that the letter would be designed to "push" AMAC or to affect decisions regarding the management team; that the document would "shake things up"; that Gold would draft a

13

contract with a confidentiality agreement for Farrish to sign; or that reviewing the letter would require that Farrish not think of himself as an AMAC employee. (Gold Dep. Tr. at 161:8-161:16, 164:2-164:7; Gold Aff. ¶¶ 20-21, 23.) Gold also testified that at the time he spoke with Farrish, he had already decided to leave AMAC. (Gold Dep. Tr. at 169:14-170:12.) Gold explained that he wanted to speak with Farrish because he felt bad for the sales team, he wanted to share his thoughts on why he was leaving the company, and he wanted to convey to Farrish that many of the values he had developed would be retained after his departure. (Id. at 185:16-185:20, 187:3-187:12.) While AMAC argues that Gold asking Farrish to review his resignation letter and suggesting that he might have to pay Farrish to do so would itself amount to cause for termination, there is ample room for a reasonable trier of fact to disagree with that conclusion. Accordingly, genuine issues of material fact exist for trial.

## Conclusion

For these reasons, AMAC's motion for summary judgment is denied. The parties are directed to appear for a pretrial conference on March 9, 2017, at 11:00 A.M.

**SO ORDERED.**

Dated:  New York, New York
        February 16, 2017

                                                    *John F. Keenan*
                                                    JOHN F. KEENAN
                                              United States District Judge